**ORIGINAL**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT          BRIDGEPORT
1/14/04
Kevin F. Rowe, Clerk
By_____
Deputy Clerk

| | |
|---|---|
| GERTRUDE BAYONNE,<br>        Plaintiff, | :<br>:<br>: Civ. Action No.<br>  3:03CV0712(WWE) |
| v. | :<br>: JURY TRIAL DEMANDED |
| PITNEY BOWES, INC. &<br>THE PITNEY BOWES, INC.<br>LONG TERM DISABILITY PLAN,<br>THE PITNEY BOWES, INC. LONG<br>TERM DISABILITY PLAN<br>ADMINISTRATOR AND THE<br>PITNEY BOWES, INC.<br>DISABILITY DEPARTMENT,<br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: NOVEMBER 12, 2003 |

## REVISED AMENDED COMPLAINT

Plaintiff Gertrude Bayonne (hereinafter "Ms. Bayonne" and "Plaintiff"), by and through her attorney Mark P. Carey, of Carey & Associates, P.C., files this Revised Amended Complaint against the Defendant Pitney Bowes, Inc. (hereinafter "Defendant Pitney Bowes"), against the Pitney Bowes, Inc. Long Term Disability Plan (hereinafter "Defendant Plan"), against the Pitney Bowes, Inc. Long Term Disability Plan Administrator (hereinafter "Defendant Plan Administrator" and "Defendant Benefits Committee") and against the Pitney Bowes, Inc. Disability Department (herein after Defendant Disability Department"), pursuant to Fed.R.Civ.P. 15. Ms. Bayonne alleges as follows:

I. **PRELIMINARY STATEMENT**

1. This is Plaintiff's complaint for violations of the American's With Disabilities Act (hereinafter referred to as the "ADA"), 42 U.S.C. Sec. 12101 et. seq.

2. Plaintiff's claims are based on a continuing violation of her rights under the ADA. A continuing violation claim can be successfully established by demonstrating that all adverse employment actions experienced by Plaintiff inside and outside the three-hundred day statute of limitations, for dually filed administrative charges, are so closely and causally connected, that the acts are said to be one continuous and ongoing action of discrimination. More important, Defendant Pitney Bowes maintains a policy that has a disproportionate impact upon individuals with disabilities; the Defendant Pitney Bowes denies requests for reasonable accommodations, short term disability leave benefits, and retaliates against disabled employees who request them.

3. Plaintiff also asserts claims for violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (a)(3), for wrongful denial of disability benefits and discriminatory interference with the attainment of such benefits.

4. Plaintiff also asserts a pendent claim for a violation of Connecticut's Fair Employment Practices Act (FEPA), Conn. Gen. Statutes § 46a et.seq.

II. **JURISDICTION AND VENUE**

5. Jurisdiction of this Court is invoked pursuant to: 28 U.S.C. Sec. 451, 1331, and 42 U.S.C. Sec. 12117. This action is authorized and instituted pursuant to Section 107(a) of the American's With Disabilities Act of 1990, 42 U.S.C. Sec. 12117(a)

and pursuant to Sec. 102 of the Civil Rights Act of 1991, 42 U.S.C. Sect. 1981a; and pendent jurisdiction is provided for pursuant to 29 U.S.C. § 1367 for a violation of FEPA, Conn. Gen. Stat. § 46a et.seq.

6. Plaintiff also brings this action for declaratory, injunctive, and monetary relief pursuant to § 502(a)(1)(B) and (a)(3) of ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3). Plaintiff also brings a claim for retaliation pursuant to ERISA § 510. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e) and (f), 29 U.S.C. § 1132(e) and (f).

7. Venue is proper in the District of Connecticut under 28 U.S.C. Sec. 1391. At the time of the commencement of this action, the Plaintiff resided in Stamford, Connecticut, County of Fairfield. The Plaintiff now resides in Pittsford, New York. The Defendant Pitney Bowes, Inc. is authorized to do business in the State of Connecticut, and the employment practices alleged to be unlawful, were committed within the jurisdiction of the United States District Court for the District of Connecticut. The Defendant Plan is an employee welfare benefit plan pursuant to ERISA and provided to Defendant Pitney Bowes employees in the State of Connecticut, and the employment practices/welfare benefit practices alleged to be unlawful, were committed within the jurisdiction of the United States District Court for the District of Connecticut. The Defendants Plan Administrator and Defendant Disability Department are delegated discretion to administer and interpret the Defendant Pitney Bowes LTD Plan welfare benefit plan for Defendant Pitney Bowes employees whom file claims under such plan in the State of Connecticut. The ERISA practices alleged to be unlawful were committed with the jurisdiction of the United States District Court for the District of Connecticut.

### III. PARTIES

8. On November 22, 2003, the Defendant Pitney Bowes discriminatorily denied Ms. Bayonne's claim for short term disability benefits.

9. On November 27, 2002, Ms. Bayonne filed a dual charge of employment discrimination with the Boston Area Office of the United States Equal Employment Opportunity Commission [hereinafter referred to as the "EEOC"], and with the Connecticut Commission on Human Rights & Opportunities [hereinafter referred to as "CCHRO"]. The EEOC and CCHRO operate a work sharing agreement whereby the Plaintiff filed a dual charge with both administrative agencies on the same date. Ms. Bayonne subsequently filed her CCHRO charge on January 21, 2003. All conditions precedent to the institution of this lawsuit, pursuant to the ADA and FEPA, have been fulfilled. On January 21, 2003, Ms. Bayonne received a Notice of Right to Sue from the EEOC. (Exhibit A attached herein). She has filed a timely suit on this date, within the 90 day statute of limitations period. On October 23, 2003, Ms. Bayonne received a Release to Sue from the CCHRO (Exhibit A attached herein) and has now filed a timely suit on this date, within the 90 day statute of limitations period.

10. Ms. Bayonne formerly resided at 44 Strawberry Hill Avenue, Unit 3H, Stamford, Connecticut 06902 [County of Fairfield]. Ms. Bayonne now currently resides at 16 Parkview Drive, Pittsford, NY 14534. Such that Ms. Bayonne has standing to maintain this action. During all relevant times of her employment she was a qualified person with a disability of a severe neurologic disorder post acoustic neuroma [hereinafter referred to as the "substantially impairing disability"], which substantially

4

impairs one or more major life activities, i.e. caring for herself, neurological system, gait, walking, memory, sleep, hearing, speech, paresis. 42 U.S.C. Sec. 12102(2)(A). Her disability cannot be mitigated by medication, self-accommodation or other medical treatment. At all relevant times during her employment, Ms. Bayonne was an employee with Pitney Bowes and is entitled to the protections afforded by Title I of the ADA. 42 U.S.C. Sec. 12111(4).

11. The Defendant Pitney Bowes, a publicly held corporation, conducts business in the State of Connecticut. Ms. Bayonne was employed at the Defendant's offices located at in Stamford, Connecticut. The Defendant Pitney Bowes employs more than 501 hundred employees. The Defendant Pitney Bowes also maintains corporate offices at 1 Elmcroft Road, in Stamford, Connecticut 06926.

12. At all relevant times, the Defendant Pitney Bowes has continuously been an "employer" engaged in an industry affecting commerce under Sec. 101(5) of the ADA, 42 U.S.C. Sec. 12111(5) and Sec. 101(7) and (h) of Title VII, 42 U.S.C. Sec 2000e-(g) and (h).

13. At all relevant times, the Defendant Pitney Bowes has been a covered entity under Sec. 101(2) of the ADA, 42 U.S.C. Sec. 12111(2).

14. At all relevant times, Ms. Bayonne was and is a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in Defendant Plan, as administered by the Defendant Plan Administrator and Defendant Disability Department.

15. At all relevant times, the Defendant Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), sponsored by Defendant Pitney Bowes, Inc. and administered in the State of Connecticut by the Defendant Plan

Administrator and the Defendant Disability Department. At all relevant times, the Defendant Plan offered long-term disability benefits to employees of Defendant Pitney Bowes, Inc., including Ms. Bayonne, through a Summary Plan Description and Long Term Disability Plan document. (Exhibit B attached herein)

16. At all relevant times, Defendant Pitney Bowes LTD Plan Administrator (a.k.a. "the Benefits Committee") and the Pitney Bowes, Inc. Disability Department are fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21)(A). ERISA defines a fiduciary as anyone who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). ERISA also provides that every plan "shall provide for one or more named fiduciaries who ... shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). According to the Defendant's Plan (Exhibit B to the Proposed Revised Amended Complaint at pp. 49-50, 56),

> 7.6 [Plan Administrator] The Employee Benefits Committee shall be the 'Plan Administrator' of the Plan for purposes of ERISA. . .
> 7.1 [The Committee] Employee Benefits Committee shall be responsible for the general administration of the Plan and for carrying out the provisions thereof. The Employee Benefits Committee shall have powers necessary to enable its members to properly carry out their duties, subject at all times to the limitations and conditions specified in or imposed by the Plan. The Employee Benefits Committee has delegated ongoing, day-to-day administrative responsibility under the Plan to the Pitney Bowes Disability Department and the Benefits Department.
> . .
> 7.5 [Powers and Duties of Employee Benefits Committee] The Employee Benefits Committee shall have discretion in exercising the following powers and duties concerning the Plan: . . .
> > (b) to interpret and construe the terms and provisions of the Plan, to apply such terms and provisions as the Committee may exclusively determine, to determine questions of eligibility and of the status and

        rights of Participants;

(c) to make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of the Plan;

(d) to delegate to the Disability Department at Pitney Bowes such powers and duties to enable it to administer the Plan; and

(e) to delegate to the benefits committee of a particular Employer, any of the powers and duties described herein for the purpose of administering the Plan as it pertains to Participants who are Employees of the Employer.

17. The Defendant Pitney Bowes, Inc. LTD Plan Administrator and the Pitney Bowes, Inc. Disability Department administer the Pitney Bowes, Inc. Long Term Disability Plan at the corporate headquarters of Pitney Bowes, Inc., located at MSC 07-00, One Elmcroft Road, Stamford, Connecticut 06926.

## IV.  **STATEMENT OF FACTS**

18. Ms. Bayonne was hired by Pitney Bowes in 1992.

19. On April 19, 2000, Ms. Bayonne had surgery performed by Dr. John Kveton to remove a small intracanalicular left acoustic neuroma.

20. On January 18, 2001, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes, "Gertrude Bayonne has been under my care since October of 2000. She is neurologically unable to work full time. However, she is able to work a 32-hour week in a four-day period. This should be in affect until further notice."

21. On August 1, 2001, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes and stated in pertinent part,

> Ms. Bayonne has been under my care since October 2000. She has a permanent neurological deficit following brain surgery for a brain tumor in April 2000. Her deficits include left hearing loss/vertigo, left facial weakness/numbness, headache and left upper and lower extremity weakness. Her symptoms worsen significantly with fatigue which is common in neurologicdisease and unfortunately have not been responsive to any of a myriad of medications. Ms. Bayonne's neurologic

symptoms are permanent, not responsive to medication and as a result of significant headache, vertigo/imbalance and left hemiparesis have left her neurologically disabled. She has been seen by a number of physicians and neurologists all with similar consensus.

22. On December 18, 2001, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes, "Ms. Bayonne will be medically unable to work for two weeks while she is under going neurological care."

23. On July 3, 2002, the Defendant Pitney Bowes sent a letter to Ms. Bayonne and stated, "TIME OUT is unable to determine if your condition meets the total disability requirement for Short Term Disability . . . benefits due to lack of information. . .Please note that failure to provide information will result in the closure of this claim within five (5) business days from the date of this letter. If this claim is closed, your absence will not be approved. This may result in termination of employment."

24. On July 5, 2002, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes, "As of July 8, 2002, Ms. Bayonne is able to return to her job as a cashier, but at 32 hours a week. She will be reevaluated on July 30, 2002 and assess changing her hours further."

25. On July 10, 2002, the Defendant Pitney Bowes sent Ms. Bayonne a letter which stated in pertinent part, "Based on our review of your file and all relevant information it has been determined that your condition does not meet the requirement to qualify for Short Term Disability . . . benefits. Therefore, Short Term Disability . . .benefits have been denied effective 6/24/2002 for the following reason(s): No initial medical information has been provided for our review."

26.  On July 22, 2002, the Defendant Pitney Bowes sent Ms. Bayonne a letter which stated the identical rationale set forth in the July 10, 2002 letter and concluded, "medical documentation provided does not support your disability."

27.  On August 1, 2002, Ms. Bayonne sent a letter to the Defendant Pitney Bowes and stated in pertinent part,

> At this time my neurologist has indicated that there is no treatment or cure for my side effects that I am suffering. I was denied disability 6 months after the surgery. I went back to work and have tried and cannot effectively do my job up to the level that I am expected. Being deaf, having to swing my head is impossible to work in an open and such heaving traffic noise. I would like to have the opportunity to work 32 hours in order to see if this works out for me. I am asking for accommodations due to my disability. I have always been a good worker and up until my disability was not absent other than the normal occasional absences. I fact, it was my choice to try and return to work after my brain operation when I could have continued to be approved medically. I am asking that you look very carefully at the medical information provided and work with me to see if we can come to some compromise. Because of the nature of my disability, I am at a loss to know exactly how I am feeling each every day. Sometimes, I feel OK when I get to work but during working I begin to feel ill and must go home.

28.  On August 12, 2002, the Defendant Pitney Bowes sent a letter to Ms. Bayonne and stated in pertinent part, "Based upon the medical information provided to us by your attending physician and relevant provisions of the Short Term Disability . . . .policy, it has been determined that your modified transitional schedule from Short Term Disability . . . benefits to full return to work will begin on 07/08/2002 and extend through 10/11/2002 based on the following conditions: Limit to: 6 hr/day."

29.  On August 12, 2002, the Defendant Pitney Bowes sent a letter to Ms. Bayonne and stated, "the information reviewed substantiates total disability for the period from 6/24/2002 through 07/05/2002, and you are, therefore approved from 06/24/2002."

30. On August 13, 2002, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes, "Ms. Bayonne is temporarily 100% disabled and we will reevaluate her on September 5, 2002."

31. On September 5, 2002, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes, "Ms. Bayonne is temporarily 100% disabled and we will reevaluate her on September 26, 2002."

32. On September 12, 2002, the Defendant Pitney Bowes sent Ms. Bayonne a letter approving STD benefits, "it has been determined that your Short Term Disability . . .benefit will begin on 08/12/2002 and extend through 09/27/2002 based on the following conditions: (1) you are otherwise eligible, and (2) no additional information is received which alters this determination."

33. On September 18, 2002, the Defendant Pitney Bowes sent Ms. Bayonne for a functional capacity review to determine if she could perform functions of her own or any occupation. The report was dated on September 23, 2002 and allegedly found that Ms. Bayonne was capable of performing sedentary work duties and she had exhibited symptom magnification during testing.

34. On September 27, 2002, the Defendant Pitney Bowes sent Ms. Bayonne a letter approving STD benefits, "it has been determined that your Short Term Disability . . . benefit will begin on 08/12/2002 and extend through 11/01/2002 based on the following conditions: (1) you are otherwise eligible, and (2) no additional information is received which alters this determination."

35. On September 30, 2002, Ms. Bayonne's treating neurologist sent the Defendant Pitney Bowes a letter and stated, "Ms. Bayonne was seen in neurologic

follow-up on September 26, 2002. It has become clear that she is medically unable to work any longer and is permanently disabled."

36.  On October 15, 2002, the Defendant Pitney Bowes had Ms. Bayonne sent to an Independent Medical Examination with consultant neurologist Dr. Elliot Gross. Dr. Gross made the following written statement on October 29, 2002:

> The overall impression is that there is tremendous symptom magnification and apparent neurological deficits which are not anatomically correlated to the surgical removal of the acoustic... I believe that her symptoms post-operatively are primarily characterized by symptom magnification and has no bearing on any organic structural disability incurred from the operation. Further, I feel she can continue to work as a cashier without any restrictions.

37.  On November 1, 2002, Defendant Pitney Bowes's physician advisor Dr. Arthur Broder, issued a written report that stated in pertinent part,

> Based on review of the records from Drs. Resor, Einbinder and Xu, it is medically evident that the neurologic and physiatric treatment to Ms. Bayonne in the past and currently, would be unrelated to any anatomical, pathophysiological condition that can be corroborated and substantiated by valid, neurologic assessments. . . . Ms. Bayonne's apparent affliction with a condition compatible with symptom magnification, can only be explained by Ms. Bayonne's possible affliction with conscious forcing. The reasons for conscious forcing are therefore then known only to Ms. Bayonne. Dr. Gross' neurological opinion apparently is valid and can be corroborated by Ms. Bayonne's evidencing the absence of any neurophysiological objective, positive findings that would corroborate and substantiate her persistent presentation to Drs. Einbinder and Xu.

39.  On November 4, 2002, Defendant Pitney Bowes' Associate Medical Director, Dr. Brent Pawlecki, produced a medical review statement for Ms. Bayonne's STD claim. Dr. Pawlecki stated in pertinent part:

> her neuro claimed that ee is permanently disabled. Neuro IME reveals ee is symptom magnification and can [return to work] RTW [without restriction]. Return to limited duties, 11/5/02 and advance to full time and full duties on 11/11/02.

11

40.   On November 12, 2002, Ms. Bayonne's treating neurologist sent a letter to the Defendant Pitney Bowes and stated in pertinent part as follows:

> As you may recall it has been my impression that she is medically unable to work. She has tried to work since her surgery as a result of increasing neurologic symptoms when she is fatigued which include headache and neck pain she cannot. Dr. Gross believes that Ms. Bayonne is able to work and feels that her symptoms are a result of symptom magnification and 'apparent neurological deficits which are not anatomically correlated to the surgical removal of the acoustic.' While I understand his impression it is clear that headache following posterior fossa surgery can occur and can be quite difficult to treat and worsened with fatigue as well. It is also clear that in cases with acoustic neuroma there can be persistent VII and VIII nerve dysfunction resulting in facial weakness and vertigo again which worsens with fatigue. Ms. Bayonne has a documented weakness of her face on the side of the surgery and has a documented abnormality on ENG consistent with vertigo all of which worsen when fatigued. I understand that her left upper extremity symptoms are not accompanied with anatomic neurologic abnormalities, however this is not the primary reason for her disability. While I understand that Dr. Gross feels that Ms. Bayonne has symptom magnification it is clear that she objective neurologic abnormalities which result in symptoms. It is also clear that she cannot work as she has tried to aggressively and cannot get through a day, even a six hour day as her headache and vertigo become unbearable. I do not feel that one can realistically deny Ms. Bayonne disability based on Dr. Gross' IME and feel that you either need to get another neurological or ENT opinion or if you are under the opinion that she has symptom magnification and none of her symptoms are real ought to consider having her seen psychiatrically to determine whether there is an psychiatric basis for this diagnosis in a patient I feel has tried quite aggressively to return to work.

41.   On November 16, 2002, Ms. Bayonne sent a letter to Defendant Pitney Bowes and stated the following,

> I am writing to you regarding my disability which started after a removal of an acoustic tumor on April 2000. I returned to work in September [and] have tried to do my job to the best of [my] ability, unfortunately I had to stop [a] few weeks later because of the pain, the headaches, neck pain, speech problem, spasms, noise triggers my head and face pains- my balance dysfunction, swinging of my head, talking can be a big challenge . . .my condition worsen[s] under stress such as walking and all the above. Also an increase tremor occurs when lifting, holding, grasping, reaching. My gait occurs when I bend my head, at other times spontaneously the numbness of my face makes it difficult in my eye closure. My arm and leg get numb after repetitive walking. Such symptoms had been present to a lesser degree before surgery. . . My medical condition has not improved since August 12, [2002]. Pitney Bowes had requested an IME consultation and physical

evaluation which occurred a few weeks ago. After the physical evaluation, the nurse Phawana contacted me over the phone [and] stated that my job site did not have or could not accommodate me because of my condition, in addition I have received another call from the same nurse stating that, I am capable of returning to work at this time. I am very confuse[d] as what to do...

42. On November 19, 2002, Ms. Bayonne sent a letter to the Defendant Pitney Bowes,

I would like to take this opportunity to reiterate to you that my medical condition has not improved in the last few months. After my brain surgery, I tried to return to work and I was performing to the best of my ability, and as stated by all my doctors Dr. Einbinder, Dr. P. Xu and Dr. Devaraj Shanty, my functional capacity has decreased significantly and I am presently unable to continue working. It seems very unprofessional to me that someone else not familiar with my case, will take only twenty minutes to review my medical records asses my medical status, and render a decision about my ability to return to work, assuming that I am losing 'it' or that I am faking it. I rather be working than sitting home at 51 years of age. I am requesting a professional revaluation of my case or in other words the acceptance of the professional opinion provided by the above respected care providers, who have been monitoring my medical condition over the last few years."

43. On November 22, 2002, the Defendant Pitney Bowes denied Ms. Bayonne's Short Term Disability benefits, based on the same findings contained in the IME report and functional capacity review report. In addition, the Defendant Pitney Bowes placed the responsibility of psychiatric evaluation on Ms. Bayonne's treating neurologist. However, the treating neurologist's medical opinion was that there was a need for a psychiatric review, but neither the Defendant Pitney Bowes or later the Defendant Plan Administrator and Defendant Disability Department ever requested such an IME. Ms. Bayonne would have become eligible for company Long Term Disability benefits had she remained on STD until January 1, 2003. The Defendant Pitney Bowes terminated Ms. Bayonne's STD before she could meet the qualifying period under the Defendant Plan.

44. On November 27, 2002, Ms. Bayonne filed her application for Long Term Disability Benefits with the Defendant Plan and the Defendant Plan Administrator and Defendant Disability Department, acting as the Plan Administrator of the LTD plan.

45. On November 27, 2002, Ms. Bayonne filed her dual charge of discrimination with the EEOC and the CCHRO against the Defendant Pitney Bowes. The charges specifically allege discrimination based on her physical disability and retaliation,

> The complainant has been discriminated against based on her physical disability (neurologic disorder post acoustic neuroma) (medical documentation enclosed herein), pursuant to the Americans With Disabilities Act. Complainant has been wrongfully denied continuation of Short Term Disability benefits offered directly (self insured) from Pitney Bowes. The denial of benefits was discriminatory, because the complainant provided comprehensive and supportive medical documentation. Thus, the request for disability leave was a protected activity and there was a close relationship between the request (previously approved) and the denial of the continuation of STD benefits. In addition, the denial of STD benefits by the company was intended to prevent complainant from receiving Long Term Disability benefits and force her eventual termination.

46. On December 5, 2002, Dr. Peter Griffin, Defendant Pitney Bowes' and Defendant Plan Administrator's Physician Consultant, sent a memo to Defendant Plan and stated, "deny LTD benefit. See STD denial of 11/22/02."

47. On December 16, 2003, the Defendant Plan denied Ms. Bayonne's claim for LTD benefits. The denial was based upon a finding of symptom magnification resulting from a functional capacity examination and a twenty-minute examination conducted by a neurologist. Neither individual examiner possessed any qualifications to render a psychiatric diagnosis of symptom magnification. The explanation for denial of the short and long term disability benefits were identical. The denial was made 19 days

after the original dual charge of discrimination was filed. The denial letter stated in pertinent part:

> Effective, 11/5/02, you do not qualify for benefits under the Pitney Bowes Inc. Long-Term Disability Plan (the "Plan"). Therefore, your Plan benefits will be denied, effective, 11/5/2002. This decision was based upon a review by Pitney Bowes' Physician Consultant, Dr. Peter Griffin, of medical information received from your physician. In addition to Dr. Peter Griffin, the following medical expert's advice was obtained on behalf of the Plan in connection with your claim: Dr. Elliott G. Gross, neurologist, and Edward M. Velasquez, physical therapist. The medical information received for review, does not substantiate that you are totally disabled for your own occupation as defined in Section 2.33(a) of the Plan (copy attached). More specifically, the Functional Capacity Evaluation which was performed at your home on September 18, 2002 you demonstrated a sub-consistent effort and tested positive for Waddell's Non-Organic Signs of symptom magnification. Dr. Elliot G. Gross' evaluation on 10/15/02 determines that your symptoms post-operatively are primarily characterized by symptom magnification and has no bearing on any organic structural disability incurred from the operation. In addition, Dr. Gross also feels that you can continue to work as a cashier without any restrictions. A copy of the guideline or protocol used to make this determination (if any) will be provided free of charge upon request.

48. On January 16, 2003, the EEOC issued a Notice of Right to Sue, received by Ms. Bayonne on January 21, 2003. (Exhibit A: EEOC Notice of Right to Sue dated January 16, 2003).

49. On January 21, 2003, Ms. Bayonne's attorney sent a written request by facsimile and overnight delivery to Michael Lalli, Defendant Plan's benefits attorney, for a complete copy of the STD and LTD claim file. The letter summarizes a telephone conversation between counsel and stated in pertinent part:

> Second, I requested a copy of all pertinent documents used in forming the denial of the LTD claim. Similarly, I now request copies of all pertinent documents used in forming the denial/discontinuance of the STD claim. Ms. Bayonne's STD benefits were terminated before the expiration of the STD benefits. Based on the limited summary description of benefits I have in my possession (1999 SPD and two amendments), I cannot determine whether Ms. Bayonne is required to exhaust her STD prior to filing an application for LTD benefits. The December 16, 2002 denial letter makes no reference to such an exhaustion requirement.

> Hopefully, the documents you will be providing will shed light on this and other issues.
>
> On a speaking point, I inquired why the December 16, 2002 denial letter refers to the "Effective date" of 11/5/02, when the LTD application was not formally received by the Plan Administrator until November 28, 2002, via overnight delivery. It appears that the LTD denial occurred prior to the receipt of the formal LTD application.
>
> Third, I addressed the objective medical documentation that was provided during both the STD and LTD benefit processes. Specifically, I addressed the November 12, 2002 letter from Dr. Roslyn Einbinder, my client's neurologist, to the Plan Administrator. In it, Dr. Einbinder questioned and disagreed with Dr. Elliot Gross's opinion, and qualifications, that Ms. Bayonne has "symptom magnification", i.e. physical condition caused by a psychiatric condition. In this regard, you indicated that Dr. Gross could render a decision based on his medical background, which was not necessarily a psychiatric diagnosis. Obviously, I disagreed, but you are entitled to your opinion. I further indicated that Dr. Einbinder had requested that the Plan Administration conduct a psychiatric Independent Medical Examination (IME) to rule out/in any psychiatric condition. This office will arrange a psychiatric IME to rule out this issue, and include the information in the final appeal that will be filed. As a standard of practice and as previously stated, we utilize a forensic psychiatric physician. In light of the alleged Plan Administrator's discretion to interpret the plan document and the subsequent Firestone standard of review, the Plan Administrator must now conduct such an IME. Any further denial after receipt of the appeal that does not include a psychiatric IME report, initiated by the Plan Administrator, will result in an arbitrary decision, i.e. a wrongful denial of claim.

50. On January 21, 2003, Ms. Bayonne, through counsel, sent a letter by facsimile and overnight delivery to Phawana Chaorinuea, Defendant Plan's Administrator of Disability Claims. The letter requested pertinent documents in the LTD claim file,

> This office has been retained by Gertrude Bayonne with regard to the denial of Long Term Disability application for benefits dated December 16, 2002. Pursuant to the Employee Retirement Income Security Act (ERISA), Ms. Bayonne is hereby requesting a copy of her LTD claim application file ("pertinent documents"). Please forward such claim file to this office upon your receipt of this file. This letter shall not be considered an appeal of the December 16, 2002 denial letter.

51. Ms. Bayonne commenced her federal action in the United States District Court for the District of Connecticut on April 21, 2003, as against the Defendant Pitney Bowes.

52. On February 12 and 14, 2003, Ms. Bayonne underwent extensive psychiatric and neurocognitive testing by forensic experts at the Connecticut Mental Health Center Law & Psychiatry Division, Department of Psychiatry, Yale School of Medicine.

53. On February 14, 2003, Ms. Bayonne's attorney telephoned Michael Lalli, Defendant Plan's benefits counsel requesting copies of the STD and LTD claim file and also notified Defendant Plan Administrator that Ms. Bayonne is being evaluated by a forensic psychiatrist to rule out the issue of "symptom magnification."

54. On March 2, 2003, Ms. Bayonne, through counsel, sent another written request for copies of the LTD claim file to the Defendant Plan Administrator and Defendant Disability Department, which was due by February 20, 2003. The letter stated,

> This letter is being sent as a follow up to our telephone conversation on February 24, 2003 and my previous two letters to Phawana Chaorinuea, Administrator Disability Claims, and your office on January 21, 2003.
>
> This letter will serve to notify the Plan Administrator for the Pitney Bowes, Inc. Long Term Disability Plan that the claimant/beneficiary Ms. Bayonne has not received any pertinent documents after her written request on January 21, 2003. Such documents should have been received by February 21, 2003. Thus, Pitney Bowes is in violation of ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4):
>
> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.