FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2004 MAY -7 A 10: 10

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| **GERTRUDE BAYONNE,** | : | |
| Plaintiff, | | |
| | : | Civ. Action No.<br>3:03CV0712(WWE) |
| v. | : | |
| **PITNEY BOWES, INC. &**<br>**THE PITNEY BOWES, INC.**<br>**LONG TERM DISABILITY PLAN,**<br>**THE PITNEY BOWES, INC. LONG**<br>**TERM DISABILITY PLAN**<br>**ADMINISTRATOR AND THE**<br>**PITNEY BOWES, INC.**<br>**DISABILITY DEPARTMENT,** | :<br><br>:<br><br>:<br><br>: | |
| Defendants. | : | MAY 6, 2004 |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER ERISA CLAIMS

Plaintiff Gertrude Bayonne ("Ms. Bayonne") hereby files this Memorandum of Law in Support of her Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c). Ms. Bayonne seeks a declaratory judgment, injunctive and equitable relief on her Employee Retirement Income Security Act ("ERISA") suit based on an unlawful denial of her Long Term Disability ("LTD") benefits as against: the Pitney Bowes, Inc. Long Term Disability Plan ("The Plan"); the Pitney Bowes, Inc. Long Term Disability Plan Administrator ("Plan Administrator") and the Pitney Bowes, Inc. Disability Department ("Disability Department"). For the purposes of this action and this motion, the Defendant Plan is directly liable for the actions of agents the Defendant Plan Administrator and Defendant Disability Department. With respect to reference herein to "Defendants" with

regard to fiduciary actions, breaches and omissions, Ms. Bayonne is referring to Defendant Plan Administrator and Defendant Disability Department. Defendant Plan cannot be a fiduciary of itself.

## I.   SUMMARY OF ARGUMENT

This case is about a serious abuse of fiduciary discretion. As the argument below will show in particular detail, the Defendants denied both short and long term disability benefits not based on objective medical findings. The Defendants intentionally, arbitrarily and capriciously ignored the medical evidence of Ms. Bayonne's treating physicians, Defendants own physician consultants, and a detailed psychiatric/neurocognitive report produced by the her.

During Ms. Bayonne's psychiatric evaluation, the forensic expert asked her the meaning of the proverb, "what goes around comes around," for which she replied "If you do something bad, then something bad is coming." (Plaintiff's Statement of Facts: Appendix A: Administrative Record at p. 408). The Defendants did something "bad" in arbitrarily and capriciously denying her short and long term disability benefits, and now Ms. Bayonne is requesting a partial summary judgment against the Defendants.

## II.   STATEMENT OF FACTS

### A.   Medical Facts, Initial STD Claim and Denial by Defendants

Ms. Bayonne is currently 52 years of age and was hired by Pitney Bowes in 1992 as a cashier, before going out on short term disability leave. (Plaintiff's Statement of Facts ¶¶ 23, 24)

Ms. Bayonne continuously sought treatment for her medical conditions "neck and pain", "pain on the left side of her cervical spine", "hearing loss","fatigue", "progressive

balance difficulty", "acoustic neuroma" throughout early 2000. (Plaintiff's Statement of Fact ¶¶ 25, 26, 27).

On April 19, 2000, Ms. Bayonne had surgery to remove a intracranalicular left acoustic neuroma by Dr. John Kveton. (Plaintiff's Statement of Fact ¶ 28). However, on July 7, 2000, Dr. Kveton reported to Ms. Bayonne's treating physician Dr. Evangelos Xistris, "unfortunately, she continues to have significant problems with her gait. She also notes an increased tremor that occurs as she is walking, and at other times, spontaneously. . .I am at a loss to explain these symptoms. . ." (Plaintiff's Statement of Facts ¶ 29).

On August 11, 2000 and October 10, 2000, Ms. Bayonne's treating neurologist Dr. Roslyn Posner Einbinder wrote letters to her employer regarding her limited return to work status. (Plaintiff's Statement of Facts ¶¶ 30, 31). However, Dr. Einbinder also noted in a letter to Dr. Kveton, "she does feel that her neck pain is worse since her recent surgery. Neurological review of symptoms is remarkable for poor balance which she tends to wall into objects on both sides of her. She also has three episodes per week of clearly described vertigo. This preceded her surgery. She is deaf in her left ear. Her left eye bothers her and feels sore." (Plaintiff's Statement of Facts ¶ 32). On October 27, 2000, Dr. Einbinder issued another letter to her employer regarding limited return to work status, "as of October 30 Ms. Bayonne is able to return to full time work. No lifting over 15lbs, repetitive walking without being able to sit and rest a bit." (Plaintiff's Statement of Facts ¶ 33). On the same date, Dr. Einbinder wrote, "there continues to be a mild drift of the left upper extremity with a fine tremor on both outstretched hands, left more than right." (Plaintiff's Statement of Facts ¶ 34).

On January 18, 2001, Dr. Einbinder wrote a letter to her employer, "She is neurologically unable to work full time. However, she is able to work a 32-hour week in a four day period. This should be in effect until further notice." (Plaintiff's Statement of Facts ¶ 35).

On August 1, 2001, Dr. Einbinder wrote a letter to her employer regarding her progressively degrading medical condition,

> Ms. Bayonne has been under my care since October 2000. She has a permanent neurological deficit following brain surgery for a brain tumor in April 2000. Her deficits include left hearing loss/vertigo, left facial weakness/numbness, headache and left upper and lower extremity weakness. Her symptoms worsen significantly with fatigue which is common in neurologicaldisease and unfortunately have not been responsive to any of a myriad of medications. Ms. Bayonne's neurologic symptoms are permanent, not responsive to medication and as a result of significant headache, vertigo/imbalance and left hemiparesis have left her neurologically disabled. She has been seen by a number of physicians and neurologists all with similar consensus.

(Plaintiff's Statement of Facts ¶ 36).

On December 3, 2001, Ms. Bayonne's treating neurologist Dr. Louise Resor issued a medical evaluation concurring with Dr. Einbinder's view regarding her progressively degrading medical condition,

> She has however, since that time, been troubled by intermittent left sided numbness, some twitching in the left side of the neck and left arm. It is difficult to get the time course of these symptoms. Initially, it seemed as if they had disappeared following surgery, only to reoccur in the last year. Other times it Ms. Bayonne notes these symptoms have been present since the surgery on the acoustic neuroma. She occasionally gets left sided headaches without nausea or vomiting. Of note is the fact that for the past few months she had had numbness in the inside of the right leg. . . In summary, this is a middle-aged woman who has undergone surgery for an acoustic neuroma. Since that time, she has complained of left sided numbness and clumsiness. It is unclear whether these symptoms have worsened, and the etiology of her left side symptomatology is unclear.

(Plaintiff's Statement of Facts ¶ 37).

4

On December 18, 2001, Dr. Einbinder sent a letter to her employer, "Ms. Bayonne is medically unable to work for two weeks while she is undergoing neurologic care." (Plaintiff's Statement of Facts ¶ 38).

On July 2 and 3, 2002, Defendants sent Ms. Bayonne information regarding her claim for short term disability benefits. (Plaintiff's Statement of Facts ¶¶ 39, 40).

On July 5, 2002, Dr. Einbinder sent her employer a letter regarding her limited return to work status of 32 hour per a four day week. (Plaintiff's Statement of Facts ¶ 41).

On July 10, 2002, Defendants denied Ms. Bayonne's short term disability claim allegedly because her medical documentation did not support her disability. (Plainitff's Statement of Facts ¶ 42).

On July 12, 2002, Dr. Einbinder made a referral to Dr. Madeline Kitaj for treatment of Ms. Bayonne's continuing headaches. (Plaintiff's Statement of Facts ¶ 43).

On July 15, 2002, Dr. Einbinder sent Defendants her treating physician statement in support of short term disability benefits, "prognosis uncertain. Return to work uncertain". (Plaintiff's Statement of Facts ¶ 44).

On July 19 and 22, 2002, Defendants issued a denial of Ms. Bayonne's short term disability claim because medical documentation did not support disability. (Plaintiff's Statement of Facts ¶¶ 45, 46).

Ms. Bayonne's treating physician Dr. Priscilla Xu rendered identical medical evaluations in support of disability on July 24 and November 16, 2002. (Plaintiff's Statement of Facts ¶¶ 47, 72).

On July 30, 2002, Dr. Einbinder sent a letter to her employer regarding her limited 32 hour per week return to work status. (Plaintiff's Statement of Facts ¶ 48).

On August 1, 2002, Ms. Bayonne appealed the denial of her short term disability claim, "In fact, it was my choice to try and return to work after my brain operation when I could have continued to be approved medically. . .I am at a loss to know exactly how I am feeling each every day. Sometimes, I feel OK when I get to work but during working I begin to feel ill and must go home." (Plaintiff's Statement of Facts ¶ 49).

On August 9 and August 12, 2002, Defendants physician consultant Dr. Peter Griffin, who never personally examined Ms. Bayonne, approved short term disability benefits for the period from June 24 to October 11, 2002, with a six hour per week work restriction, and noted that Dr. Einbinder stated to him "it is likely that her symptoms will progress." Defendants stated, "the information reviewed substantiates total disability for the period from 06/24/02 through 07/05/02." (Plaintiff's Statement of Facts ¶¶ 50, 51, 52).

On August 12 and September 5, 2002, Dr. Einbinder informed the Defendants, "Ms. Bayonne is temporarily 100% disabled." (Plaintiff's Statement of Facts ¶ 53, 54).

In an undated note to Ms. Bayonne's claim file, Phawana Chaorinue, from Defendant Disability Department, noted "will revisit this issue after resolve the mystery of her medical condition." (Plaintiff's Statement of Facts ¶ 55).

On September 12 and 27, 2002, Defendants approved Ms. Bayonne's short term disability benefits for the period from August 12, 2002 to November 1, 2002." (Plaintiff's Statement of Facts ¶ 56, 59).

On September 16, 2002, Defendants physician consultant Dr. Arthur Boder, who never personally examined Ms. Bayonne, made a referral to PhysioMetrics for a Functional Capacity Evaluation ("FCE"), and presupposed Ms. Bayonne was feigning her

6

symptoms. (Plaintiff's Statement of Facts ¶ 57). On September 23, 2002, PhysioMetrics issued a FCE report that alleged Ms. Bayonne tested positive for symptom magnification. (Plaintiff's Statement of Facts ¶ 58). The Defendants did not conduct a psychiatric Independent Medical Evaluation ("IME"), nor did any individual who conducted the FCE have a psychiatric background.

On September 30, 2002, Dr. Einbinder sent Defendants an updated medical evaluation, "It has become clear that she is medically unable to work any longer and is permanently disabled." (Plaintiff's Statement of Facts ¶ 61).

On September 30, 2002 and October 2, 2002, Defendants requested Ms. Bayonne attend an IME with consultant neurologist Dr. Elliot Gross on October 15, 2002. Dr. Broder, who never personally examined Ms. Bayonne, again presupposes symptom magnification and feigning to Dr. Gross,

> Ms. Bayonne has been afflicted with headaches since 1993, therefore, there is absence of any causal relationship between the acoustic neuroma surgery and the headaches. . .The left upper and lower extremity weakness is based upon a condition compatible with conscious forcing, symptom magnification, non-organic/non-structural pain syndrome. . .

(Plaintiff's Statement of Facts ¶¶ 60, 62, 64, 65, 66).

However, on October 4, 2002, Dr. Broder, who never personally examined Ms. Bayonne, provided helpful insight to the alleged mysterious nature of Ms. Bayonne's medical disability and the possibility that a permanent injury occurred due to the acoustic neuroma tumor, "there is the possibility, that the facial nerve, may have sustained some injury during dissection/removal of the tumor. This is a known possible, surgical, 'complication', however the tumor made have invaded the nerve, prior to surgery." (Plaintiff's Statement of Facts ¶ 63). These statements indicate that Dr. Broder was

7

uncertain about the extent of the medical damage caused by the acoustic neuroma tumor, contradicting his assessment that she was consciously forcing her medical symptoms. The tumor could reasonably have caused additional medical disability for which even Dr. Broder could not account for.

On October 29, 2002, Dr. Gross issued his IME report that stated in pertinent part, "very variable type of dysartria (verbal motor difficulty) which was difficult to characterize. . .she demonstrated an irregular, unusual type of tremor" but he notes "tremendous symptom magnification," and released her to full time work. There is no evidence in the administrative record that Dr. Gross possessed the medical training to render a psychiatric evaluation, nor did Defendants ever request such IME. (Plaintiff's Statement of Facts ¶ 67).

On November 1, 2002, Dr. Broder, who never personally examined Ms. Bayonne, issued a report to Defendants now confirming diagnosis of symptom magnification, "Ms. Bayonne's apparent affliction with a condition compatible with symptom magnification, can only be explained by Ms. Bayonne's possible affliction with conscious forcing. The reasons for conscious forcing are therefore then known only to Ms. Bayonne." (Plaintiff's Statement of Facts ¶ 68). On November 4, 2002, Defendants denied short term disability claim and returned Ms. Bayonne to full time work on November 11, 2002. (Plaintiff's Statement of Facts ¶ 69).

On November 12, 2002, Dr. Einbinder sent a letter to Defendants rebutting Dr. Gross' IME report findings,

> . . .it is clear that headaches following posterior fossa surgery can occur and can be quite difficult to treat and worsened with fatigue as well. It is also clear that in cases with acoustic neuroma there can be persistent VII and VIII nerve dysfunction resulting in facial weakness and vertigo again which worsens with

8

> fatigue. Ms. Bayonne has a documented weakness of her face on the side of the surgery and has a documented abnormality on ENG consistent with vertigo all of which worsen when fatigued. . .it is clear that she has objective neurologic abnormalities which result in symptoms. . .I do not feel that one can realistically deny Ms. Bayonne disability based on Dr. Gross' IME and feel that you either need to get another neurologic or ENT opinion or if you are under the opinion that she has symptom magnification and none of her symptoms are real ought to consider having her seen psychiatrically to determine whether there is a psychiatric basis for this diagnosis in a patient I feel has tried quite aggressively to return to work.

(Plaintiff's Statement of Facts ¶ 70). The Defendants never conducted a psychiatric/neurocognitive IME of Ms. Bayonne.

On November 16 and 19, 2002, Ms. Bayonne sent a letter to Defendants describing her progressively deteriorating medical disability and inability to work,

> It seems very unprofessional to me that someone (Dr. Gross) else not familiar with my case, will take only twenty minutes to review my medical records asses my medical status, and render a decision about my ability to return to work, assuming that I am losing 'it' or that I am faking it. I rather be working than sitting home at 51 years of age.

(Plaintiff's Statement of Facts ¶ 71, 73).

On November 22 and 25, 2002, Defendants denied Ms. Bayonne's short term disability without the support of psychiatric/neurocognitive IME, "medical documentation does not support your continued disability." (Plaintiff's Statement of Facts ¶ 74, 76).

On November 22, 2002, Defendants physician consultant to Dr. Griffin, who never personally examined Ms. Bayonne, denied her STD claim without a supporting psychiatric/neurocognitive IME,

> Dr. Einbinder's suggestion that a psychiatric IME be considered as a means of addressing the ee's somatization appears inconsistent with her medical care of this ee. If she felt psychiatric, nonorganic complaints were of a psychiatric, nonorganic nature then it would be incumbent on her to make this referral as the ee's treater. . . Despite these difficulties it was felt that she minimally qualified for

9

sedentary work without the implication that she could perform high levels of work were she put forth a greater effort.

(Plaintiff's Statement of Facts ¶ 75).

On November 27, 2002, Ms. Bayonne filed an application for Long Term Disability Benefits (LTD) and sent by overnight delivery. (Plaintiff's Statement of Facts ¶ 77).

On December 5 and 16, 2002, Defendants denied Ms. Bayonne's claim for LTD benefits based on the same medical documentation used to deny her STD claim, but without a supporting psychiatric/neurocognitive IME, "deny LTD benefit. See STD denial of 11/22/02,"

> the medical information received for review, does not substantiate that you are totally disabled for your own occupation . . . you demonstrated a sub-consistent effort and tested positive for Waddell's Non-Organic Signs of symptom magnification. . .your symptoms post-operatively are primarily characterized by symptom magnification and has no bearing on any organic structural disability incurred from the operation [but not from the impact of the tumor] . . . you can continue to work as a cashier without any restrictions. A copy of the guideline or protocol used to make this determination (if any) will be provided free of charge upon request.

(Plaintiff's Statement of Facts ¶¶ 78, 79, 82, 83). The denial was sent nineteen (19) days after she filed the LTD application. (Plaintiff's Statement of Facts ¶ 80), and did not provide any reasonable notice as to what additional medical information was required to perfect the claim. (Plaintiff's Statement of Facts ¶ 81).

On January 21, 2003, Ms. Bayonne's requested the STD and LTD summary plan descriptions, pertinent documents and any "guideline or protocol" used in making the benefit denial. (Plaintiff's Statement of Facts ¶ 84, 85, 86, 87, 88, 91). Ms. Bayonned again requested the same pertinent documents on March 4, 2003, which were not produced until March 10, 2003, some fifty (50) days after they were requested.

10

(Plaintiff's Statement of Facts ¶¶ 92,93,94);(See generally Plaintiff's Statement of Facts ¶ 95).

In order to disprove Defendants rationale of symptom magnification and conscious forcing, Ms. Bayonne went through extensive psychiatric and neurocognitive testing by forensic experts at the Connecticut Mental Health Center at Yale University Medical School on February 12 and 14, 2003. (Plaintiff's Statement of Facts ¶ 90). The Defendants received a copy of the forensic report by Dr. Carolyn Drazinic on June 11, 2003. (Plaintiff's Statement of Facts ¶¶ 89, 98).

On April 19, 2003, the Social Security Administration approved Ms. Bayonne's disability claim, based on the same documentation provided to the Defendant, absent Ms. Bayonne's June 11, 2003 psychiatric/neurocognitive IME report. (Plaintiff's Statement of Facts ¶ 96). Defendants admit the SSDI standards have no relevance to Ms. Bayonne's LTD claim determination. (Plaintiff's Statement of Facts ¶ 97).

On June 11, 2003, Dr. Drazinic issued her psychiatric and neurocognitive IME report, which ruled out any conscious forcing and symptom magnification,

> According to Dr. Kveton, her persisting vestibular dysfunction, which is unusual, nevertheless could not be feigned. . .There is some debate as to whether her headache and balance problems are from the surgery as well, but in light of the objective evidence of poor vestibular compensation, as well as the possibility of a small cerebrospinal fluid leak, these symptoms could be explained.

(Plaintiff's Statement of Facts ¶¶ 98-113).

On June 11, 2003, Ms. Bayonne filed a comprehensive administrative appeal with the Defendants, which was reviewed on July 28, 2003. (Plaintiff's Statement of Facts ¶¶ 114-115) Ms. Bayonne's submitted 431 pages of documents in support of her detailed appeal memorandum. The appeal memorandum and the exhibits constituted the

11

administrative record as of June 11, 2003. The administrative record in this case also logically includes any and all correspondence sent and received between the parties between June 11, 2003 and the August 8, 2003 final denial of benefits. (See Plaintiff's Statement of Facts, Appendix A & B).

On August 8, 2003, the Defendant's Plan Administrator and Defendant Disability Department issued a written denial of the June 11, 2003 appeal, in light of Ms. Bayonne's June 11, 2003 psychiatric/neurocognitive IME report. The denial letter stated in pertinent part "...after a full and fair review of the evidence the Committee concluded that the <u>objective evidence</u> was not indicative of a total disability condition." The Defendants closed the claim file on this date. (Plaintiff's Statement of Facts ¶¶ 116-133).

The denial was based on the same rationale and medical evidence used to deny Ms. Bayonne's STD and LTD claims, but downplayed the June 11, 2003 psychiatric/neurocognitive IME report. The Defendants deferred to the initial adverse benefit determination. The Defendant Pitney Bowes employees and physician consultants also performed consultive and employment functions for the Defendant Plan Administrator and Defendant Disability Department, for both STD and LTD claims. (Plaintiff's Statement of Facts ¶ 138).

### III.  ARGUMENT

#### A.  SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.). In the present matter, the relevant facts are not in dispute and are derived directly from the information contained in the administrative record (Plaintiff's Statement of Facts Appendix A & B) before the Defendant Plan Administrator and Defendant Disability Department. Ms. Bayonne can demonstrate that the undisputed facts in the record support her claim for LTD benefits under the terms of the Defendants long term disability plan. Applying these standards, Ms. Bayonne has established her entitlement to summary judgment.

## B. MS. BAYONNE HAS STANDING TO PURSUE HER ERISA CLAIMS

Ms. Bayonne has brought two claims for relief pursuant to 29 U.S.C. § 502(a)(1)(B) and (a)(3)(B) to enforce the terms under an ERISA plan. (Plaintiff's Statement of Facts ¶ 1).

This Court has jurisdiction over the parties and over the subject matter of this dispute, pursuant to ERISA, and venue is proper. (Plaintiff's Statement of Facts ¶¶ 2,3,5,7, 24). Ms. Bayonne has exhausted all administrative remedies. (Plaintiff's Statement of Facts ¶ 4).

Defendants admit Ms. Bayonne is an employee and participant in the Defendants welfare benefit plan pursuant to ERISA 29 U.S.C. § 1002(7). (Plaintiff's Statement of Facts ¶¶ 8,9,10,11); McBride v. PLM Int'l, Inc., 179 F.3d 737 (9th Cir.1999); Coleman v. Champion Int'l Corp., 992 F.2d 530 (5th Cir.1993); Jamail, Inc. v. Carpenters District Council, 954 F.2d 299 (5th Cir.1992); Sanson v. General Motors Corp., 966 F.2d 618

13

(11th Cir.1991) and <u>Chemung Canal Trust Co. v. Sovran Bank</u>, 939 F.2d 12 (2d Cir.1991).

The Defendants Employee Benefits Committee is the Plan Administrator of the Pitney Bowes LTD Plan and serves a fiduciary under the Plan, with the specified discretion to administer and interpret the plan. (Plaintiff's Statement of Facts ¶¶ 6,12, 13, 14, 15, 16-22). A "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan. ERISA § 3(21)(A)." <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 498, 116 S.Ct. 1065, 1071.

The Defendant Disability Department is fiduciary pursuant to ERISA because it operates under the delegation of authority from the Defendant Plan Administrator and has appropriate discretion to administer and interpret the plan and benefits. (Plaintiff's Statement of Facts ¶¶ 7,13). Id. ("has any discretionary authority or discretionary responsibility in the administration" of the plan).

The Defendant Plan Administrator and Defendant Disability Department breached their fiduciary duty owed to her under the company's ERISA plan by arbitrarily and capriciously denying her claim for disability benefits (Plaintiff's Statement of Facts ¶ 139) and acting under a conflict of interest, as set forth in the LTD Summary Plan Description dated January 1, 2003. (Plaintiff's Statement of Facts ¶¶ 139-145);(Plaintiff's Revised Amended Complaint at Exhibit B). The Defendants failed to properly interpret and administer the provisions of the plan. (Plaintiff's Statement of Facts ¶ 140).

All of Ms. Bayonnes' claims, as individually asserted, seeks an "equitable remedy" under ERISA for the full value of his Long Term Disability Benefits, plus interests, costs and attorneys fees. See 29 U.S.C. § 502(g)(1); Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270 (2d Cir.1992) (actions brought under Title I "by a participant, beneficiary or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party"); Miele v. N.Y.S. Teamsters Plan, 831 F.2d 407 (2d Cir.1987); Chambers v. MM&P Pension Plan, 815 F.2d 869 (2d Cir.1987).

Section 502(a)(1)(B) specifically provides that Ms. Bayonne may bring a civil action to recover benefits due her under the terms of the plan and to enforce her rights under the terms of the plan. "A claim under this section, in essence, is the assertion of a contractual right under a benefit plan." Strom v. Goldman Sachs & Co., 202 F.3d 138, 142 (2d Cir.1999) (citing Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1133 (7th Cir.1992).

Benefit claims litigation under § 502(a)(1)(B) is in the nature of an action to enforce beneficial rights under a trust. Principles of the common law of trusts are incorporated into the federal common law of employee benefits to guide the courts in the absence of express ERISA rules. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 1 (1989); Barker v. Ceridian Corp., 122 F.3d 628 (8th Cir.1997) (when interpreting ERISA plan documents, courts should look to the law of trusts); Ream v. Frey, 107 F.3d 147 (3rd Cir.1997).

Ms. Bayonne's claim against the plan administrator, pursuant to Section 502(a)(3), is based on the statutory language that a plan participant, a plan beneficiary, or a plan fiduciary may bring civil action under ERISA: (1) to enjoin any act or practice

which violates any provision of ERISA Title I; (2) to enjoin any act or practice which violates the terms of the plan; (3) to obtain other appropriate equitable relief to redress such violations; (4) to obtain other appropriate equitable relief to enforce any provision of Title I; or (5) to obtain other appropriate equitable relief to enforce the terms of the plan. 29 U.S.C. § 502(a)(3).

The Section 502(a)(3) claim provides an alternative for an individual participant or beneficiary to obtain personal benefits from the plan. The United States Supreme Court has stated: "[t]he words of [section 502(a)(3)] 'appropriate equitable relief to redress any act or practice which violates any provision of this title' are broad enough to cover individual relief for breach of a fiduciary duty obligation. . . This structure suggests that these catchall provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that section 502 does not elsewhere adequately remedy." Varity Corp. v. Howe, 516 U.S. 489 (1996). See Strom, 202 F.3d at 150.

The Second Circuit recently held that <u>a participant can maintain an action grounded in both 502(a)(1)(B) and 502(a)(3):</u>

> Finally, we disagree with Empire's contention that "there is no private action for breach of fiduciary duty under ERISA when another remedy is available under 29 U.S.C. § 1132." Appellee's Br. at 41. Plaintiffs' cause of action for their breach of fiduciary duty claims arises from ERISA § 502(a)(3), which allows plan participants, beneficiaries or fiduciaries to bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or terms of the plan, or ... obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). In <u>Varity Corp.</u>, the Supreme Court held that such claims alleging breach of fiduciary duty could be brought by individual plaintiffs because ERISA § 502(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by [ERISA] violations that § 502 does not elsewhere adequately remedy." <u>Varity Corp.</u>, 516 U.S. at 512, 116 S.Ct. 1065. The Supreme Court further noted that, given ERISA's requirement that fiduciaries act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), "it is hard to imagine why Congress would want to immunize breaches of

16

> fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." Id. at 513, 116 S.Ct. 1065. We note that should plaintiffs' claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to enforce their rights under the plan fail, plaintiffs' breach of fiduciary duty claim is their only remaining remedy. Varity Corp. clearly provides that, where a plan participant has no remedy under another section of ERISA, she can assert a claim for breach of fiduciary duty under § 502(a)(3). Id. at 515, 116 S.Ct. 1065 (noting that ERISA's purposes would be furthered by granting a remedy where no other remedy is available); see also Strom, 202 F.3d at 149 ("[Varity Corp.] evidences a clear intention to avoid construing ERISA in a manner that would leave beneficiaries ... without any remedy at all."). Varity Corp. further explained, however, that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" Varity Corp., 516 U.S. at 515, 116 S.Ct. 1065 (emphasis added). The Supreme Court in Varity Corp. did not eliminate the possibility of a plaintiff successfully asserting a claim under both § 502(a)(1)(B), to enforce the terms of a plan, and § 502(a)(3) for breach of fiduciary duty; instead, the Court indicated that equitable relief under § 502(a)(3) would "normally" not be appropriate. Ultimately, we believe that the determination of "appropriate equitable relief" rests with the district court should plaintiffs succeed on both claims. This determination must be based on ERISA policy and the "special nature and purpose of employee benefit plans." Id. (internal quotation marks omitted). <u>We therefore hold that Varity Corp. did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available; instead, the district court's remedy is limited to such equitable relief as is considered appropriate.</u>

Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 89-90 (2d Cir. 2001).

Ms. Bayonne is entitled to bring a claim pursuant to 29 U.S.C. § 502(a)(3)(B), because the Defendant Plan Administrator and Defendants Disability Department breached its fiduciary duty owed to her under the company's ERISA plan set forth in the LTD Summary Plan Description dated January 1, 2003, as amended. (Plaintiff's Statement of Facts: Appendix A);(Plaintiff's Revised Amended Complaint at Exhibit B).

Ms. Bayonne can successfully demonstrate that the Defendant Plan Administrator and Defendant Disability Department breached their fiduciary duties owed to her and engaged in an abuse of discretion on several grounds. Most notably, the plan

17

administrator arbitrarily and capriciously denied her LTD claim in the face of objective medical evidence provided by her treating physicians/forensic experts and because it operated under a conflict of interest. (Plaintiff's Statement of Facts ¶ 141).

The Second Circuit has described a fiduciaries obligations as "the highest known to law." Donovan v. Bierwirth, 680 F.2d 263, 272, n.8 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). The Donovan Court further explained the statutory sources of this high duty:

> [ERISA] Sections 404(a)(1)(A) and (B) impose three different although overlapping standards. A fiduciary must discharge his duties 'solely in the interests of the participants and beneficiaries.' He must do this 'for the exclusive purpose' of providing benefits to them. And he must comply 'with the care, skill, prudence, and diligence under the circumstances then prevailing' of the traditional 'prudent man.'

Id. 271; (Plaintiff's Statement of Facts: Appendix A: Administrative Appeal Record pp. 1-60 [Summary Plan Description: Section 7.8 (Fiduciary Duties)). In the instant case, the facts reveal that Defendants did not in fact discharge their fiduciary duties solely in Ms. Bayonne's interests, because they lacked the care, skill, prudence and diligence under the circumstances of the case.

Courts in the Second Circuit have long emphasized the gravity of the strict duties governing ERISA fiduciaries. See e.g. John Blair Communications v. Telemundo Group, 26 F.3d 360, 367 (2d Cir.1994) ("Where fiduciary duties arise under ERISA, they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan"); Reich v. Valley National Bank, 837 F.Supp. 1259, 1286 (S.D.N.Y. 1993) (A significant purpose of ERISA is to "immunize an employee benefit plan from the employer's interest," and so the statute "requires conformity to extremely high standards."); Masella v. Blue Cross & Blue Shield of Conn., 936 F.2d 98,

107 (2d Cir.1991)(Because ERISA "abounds with the terminology of trust law," application of rule of contract interpretation construing ambiguities against insurer "is consistent with the basic principle of trust law that trust property is to be dealt with for the benefit of the beneficiary.").

In failing to take the facts of Ms. Bayonne's relevant and objective medical evidence into account when administering her claim, the Defendants did not exercise its discretion to protect her legitimate plan interests and did not conform with the extremely high fiduciary standards imposed under ERISA.

### C. THE COURT SHOULD REVIEW DEFENDANTS DECISION TO DENY MS. BAYONNE'S BENEFITS WITH A "HIGH DEGREE OF SKEPTICISIM" BECAUSE OF AN ABUSE OF DISCRETION AND CONFLICT OF INTEREST TAINTED ITS DECISION MAKING

#### 1. ERISA Standard of Review

The default standard of review in ERISA cases is *de novo*. Firestone Tire & Rubber Co., 489 U.S. 101, 115 (1989). However, ERISA defendants may receive the more deferential "arbitrary and capricious" review where the benefit plan in question delegates authority to the plan administrator. Id. Even where such delegation has been made, however, the de novo standard is restored where the administrator is determined to have operated under a conflict of interest. Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1255-56 (2d Cir.1996); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443 (2d Cir.1995). The Defendants bears the burden of proving that the arbitrary and capricious standard should apply. Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir.1995); Sharkey v. Ultramar Energy Ltd., 70 F.3d 226 (2d Cir.1995). Any ambiguities in the plan language must be construed against the administrator and in favor of the party seeking judicial review. Fay v. Oxford Health