FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT            2004 MAY -7  A 10: 10

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| GERTRUDE BAYONNE, | : | |
| Plaintiff, | | |
| | : | Civ. Action No. |
| | | 3:03CV0712(WWE) |
| v. | : | |
| | | |
| PITNEY BOWES, INC. & | : | |
| THE PITNEY BOWES, INC. | | |
| LONG TERM DISABILITY PLAN, | : | |
| THE PITNEY BOWES, INC. LONG | | |
| TERM DISABILITY PLAN | : | |
| ADMINISTRATOR AND THE | | |
| PITNEY BOWES, INC. | : | |
| DISABILITY DEPARTMENT, | | |
| Defendants. | : | MAY 6, 2004 |

**PLAINTIFF'S FED.R.CIV.P. 56(c ) AND LOCAL CIVIL RULE 9(c)(1)
STATEMENT IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT ON HER SECTION 502(a)(1)(B) & (a)(3) ERISA CLAIMS**

The following material facts are undisputed:

    1.      Plaintiff's claim involves long term disability benefits and is brought

pursuant to 29 U.S.C. § 1132(a)(1)(B) and (a)(3) of the Employee Retirement Income

Security Act (ERISA) of 1974. See Defendants Answer at ¶ 3 and Revised Amended

Complaint at ¶ 3.

    2.      29 U.S.C. §§ 1132(e) and 1132(f) grant this District Court jurisdiction

over the parties and over the subject matter of this dispute. In addition, this action may be

brought pursuant to 28 U.S.C. § 1331. See Defendants Answer at ¶¶ 5 and 6.

3.      Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391. See Defendants Answer at ¶ 7.

4.      The ERISA statute, at 29 U.S.C.§ 1133, encourages pre-suit internal appeals of benefit denials. Plaintiff has exhausted all such appeals before filing this suit. See Appendix B: Supplemental Administrative Record.

5.      Defendants admit that Pitney Bowes is authorized to do business in the State of Connecticut, and that the Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).  See Defendants Answer at ¶ 7.

6.      Defendants admit that the Plan Administrator is defined in, and has the discretion afforded under and pursuant to, the terms of the Plan. See Defendants Answer at ¶ 7.

7.      Defendants admit that the Disability Department is located in Connecticut and undertakes actions relating to the day to day administration of the Plan as provided under the Plan. See Defendants Answer at ¶ 7.

8.      Defendants admit that Plaintiff was an employee of Pitney Bowes.  As an employee, Plaintiff is and was a participant in the Pitney Bowes Inc. Long Term Disability Plan, as administered by the Defendant Plan Administrator and Defendant Disability Department, pursuant to 29 U.S.C. § 1002(7). See Defendants Answer at ¶¶ 10 and 14; Revised Amended Complaint at ¶ 14.

9.      Defendants admit that the Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1). See Defendants Answer at ¶ 15.

10.     Defendants admit that Pitney Bowes sponsors the Plan, and that the Plan is administered according to its terms, including those provisions relating to employee eligibility and participation. See Defendants Answer at ¶ 15.

11.     At all relevant times, the Defendant Plan offered long-term disability benefits to employees of Defendant Pitney Bowes, Inc., including Plaintiff, through a Summary Plan Description and Long Term Disability Plan document. See Revised Amended Complaint at ¶ 15 and Exhibit B to Revised Amended Complaint (Summary Plan Description of Pitney Bowes Inc. Long Term Disability Plan).

12.     Defendants admit that the Employee Benefits Committee serves as a fiduciary to the Plan within the meaning of 29 U.S.C. § 1002(21)(A) to the extent it undertakes acts triggering such status under that section. See Defendants Answer at ¶ 16.

13.     The Defendant Pitney Bowes Inc. Disability Department serves as a fiduciary to the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because it administered the application and claim denial with discretion as delegated to it by the Defendant Plan Administrator. See Revised Amended Complaint at ¶ 16.

14.     The Defendants Summary Plan Description states with respect to fiduciary duties,

> All fiduciaries shall discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to Participants and of defraying reasonable expenses of administering the Plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

See Revised Amended Complaint Exhibit B at p. 51 and Appendix A: Administrative Record at p. 51.

3

15.     The Defendants Employee Benefits Committee shall be the 'Plan Administrator' of the Plan for purposes of ERISA. See Revised Amended Complaint at ¶ 16 and Exhibit B at p. 50.

16.     The Employee Benefits Committee shall be responsible for the general administration of the Plan and for carrying out the provisions thereof. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record p. 49.

17.     The Employee Benefits Committee shall have powers necessary to enable its members to properly carry out their duties, subject at all times to the limitations and conditions specified in or imposed by the Plan. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record p. 49.

18.     The Employee Benefits Committee has delegated ongoing, day-to-day administrative responsibility under the Plan to the Pitney Bowes Disability Department and the Benefits Department. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record p. 49.

19.     The Employee Benefits Committee shall have the discretion in exercising the following powers and duties concerning the Plan: (b) to interpret and construe the terms and provisions of the Plan, to apply such terms and provisions as the Committee may exclusively determine, to determine questions of eligibility and of the status and rights of Participants. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record pp. 56, 49.

20.     The Employee Benefits Committee shall have the discretion in exercising the following powers and duties concerning the Plan: to make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of the

4

Plan. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record pp. 56, 50.

21.     The Employee Benefits Committee shall have the discretion in exercising the following powers and duties concerning the Plan: to delegate to the Disability Department at Pitney Bowes such powers and duties to enable it to administer the Plan. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record pp. 56, 50.

22.     The Employee Benefits Committee shall have the discretion in exercising the following powers and duties concerning the Plan: to delegate to the benefits committee of a particular Employer, any of the powers and duties described herein for the purpose of administering the Plan as it pertains to Participants who are Employees of the Employer. See Revised Amended Complaint at ¶ 16 and Exhibit B; Appendix A: Administrative Record pp. 56, 50.

23.     Plaintiff was born on November 13, 1951 and is currently fifty-two years of age. See Appendix A: Administrative Record at p. 198 (date of birth noted).

24.     Defendants admit Plaintiff was hired by Pitney Bowes in 1992 and worked as a cashier until going out on disability. See Defendants Answer at ¶ 18.

25.     On March 29, 2000, Plaintiff was seen by Dr. W. Tracy Schmidt, of Orthodaedic Associates of Stamford, P.C.  Dr. Schmidt stated in a report, "has been having neck pain off an on for several months. Has developed what sounds like an acoustic neuroma which is going to be operated on in the next month by Dr. Kveton. . .Does get some pain on the left side of her cervical spine on the same side where her ear tumor is." See Appendix A: Administrative Record at p.179.

26.    On March 31, 2000, Plaintiff was evaluated by Dr. Joseph M. Piepmeier,

Yale University School of Medicine Department of Neurosurgery, who produced a

written report of his medical observations, which stated in pertinent part,

> She has noted progressive hearing loss in the left ear associated with a feeling of
> fatigue and some pain in her neck. She has also noted some progressive balance
> difficulty. Apparently an imaging study revealed a small lesion arising in the left
> internal auditory canal consistent with an acoustic neuroma.[1] Her past medical
> history reveals a hysterectomy and hypertension. She is allergic to an unknown
> medication. She takes Ziac, Antivert and Xanax.

See Appendix A: Administrative Record at p. 187.

27.    On March 31, 2000, Plaintiff was evaluated by Dr. Joseph M. Piepmeier,

Neurologist, Yale University School of Medicine Department of Neurosurgery, who

produced a written report of his medical observations, which stated in pertinent part,

> Physical exam reveals some asymmetry in facial sensation to touch and pin on the
> left side of her face. There also is a decrease in the left frontalis branch of the
> facial nerve and decreased hearing in the left ear. Her gait and stance are normal.
> Romberg and tandem gait, however, are difficult for her.

See Appendix A: Administrative Record at p. 187.

28.    On April 19, 2000, the Plaintiff had surgery performed by Dr. John

Kveton to remove a small intracranalicular left acoustic neuroma. See Revised Amended

Complaint at ¶ 19 and Appendix A: Administrative Record at pp. 175-178.

29.    On July 7, 2000, Plaintiff's surgeon, Dr. John Kveton, sent a letter to Dr.

Evangelos Xistris. Dr. Kveton stated, "Unfortunately, she continues to have significant

problems with her gait. She also notes an increased tremor that occurs as she is walking,

and at other times, spontaneously. . .I am a loss to explain these symptoms, since her

acoustic tumor was removed through the temporal bone and the cerebellar pontine angle

---

[1] "Acoustic neuroma" is a "benign brain tumor at the base of the skull." Sanders v. Hartford, 2003 WL
1478556, *2 (June 17, 2003)(W.D.Pa.)

was not exposed during surgery. Ms. Bayonne indicated to me that such symptoms had been present, to a lesser degree, before surgery." See Appendix A: Administrative Record at pp.185-186.

30.     On August 11, 2000, Plaintiff's neurologist Dr. Roslyn Posner Einbinder wrote a medical note, "may return to work on September 4, 2000 part time with light duty." See Appendix A: Administrative Record at p.222.

31.     On October 10, 2000, Plaintiff's neurologist Dr. Roslyn Posner Einbinder wrote a medical note, "Patient should continue working four hours until 10/27/00." See Appendix A: Administrative Record at p.221.

32.     On October 10, 2000, Dr. Roslyn Posner Einbinder sent a letter to Plaintiff's surgeon Dr. John Kveton, in which she reviewed her clinical history and current symptoms. Dr. Einbinder stated, "she does feel that her neck pain is worse since her recent surgery. Neurological review of systems is remarkable for poor balance which she tends to wall into objects on both sides of her. She also has three episodes per week of clearly described vertigo. This preceded her surgery. She is deaf in her left ear. Her left eye bothers her and feels sore." See Appendix A: Administrative Record at pp.137-138.

33.     On October 27, 2000, Plaintiff's neurologist Dr. Roslyn Posner Einbinder wrote a medical note, "as of October 30 Ms. Bayonne is able to return to full time work. No lifting over 15lbs, repetitive walking without being able to sit and rest a bit." See Appendix A: Administrative Record p.220.

34.     On October 27, 2000, Dr. Roslyn Posner Einbinder issued an evaluation report, "on examination today there continues to be a mild drift of the left upper extremity with a fine tremor of both outstretched hands, left more than right." The

evaluation was conducted to determine the existence of carpal tunnel syndrome of the

right hand. See Appendix A: Administrative Record at p.144.

35.    Defendants admit receiving a letter dated January 18, 2001 from Dr.

Roslyn Posner Einbinder which states "Gertrude Bayonne has been under my care since

October of 2000. She is neurologically unable to work full time. However, she is able to

work a 32-hour week in a four day period. This should be in affect until further notice."

See Defendants Answer at ¶ 20, Revised Amended Complaint at ¶ 20 and Appendix A:

Administrative Record at p. 147.

36.    Defendants admit receiving a letter dated August 1, 2001 from Dr. Roslyn

Posner Einbinder which states in pertinent part,

> Ms. Bayonne has been under my care since October 2000. She has a permanent
> neurological deficit following brain surgery for a brain tumor in April 2000. Her
> deficits include left hearing loss/vertigo, left facial weakness/numbness, headache
> and left upper and lower extremity weakness. Her symptoms worsen significantly
> with fatigue which is common in neurologicaldisease and unfortunately have not
> been responsive to any of a myriad of medications. Ms. Bayonne's neurologic
> symptoms are permanent, not responsive to medication and as a result of
> significant headache, vertigo/imbalance and left hemiparesis have left her
> neurologically disabled. She has been seen by a number of physicians and
> neurologists all with similar consensus.

See Defendants Answer at ¶ 21, Revised Amended Complaint at ¶ 21 and Appendix A:

Administrative Record at p. 121.

37.    On December 3, 2001, Plaintiff's neurologist Dr. Louise Resor, issued a

written report regarding Ms. Bayonne's medical condition and continuing symptoms post

operative surgery, that stated in pertinent part:

> She has however, since that time, been troubled by intermittent left sided
> numbness, some twitching in the left side of the neck and left arm. It is difficult to
> get the time course of these symptoms. Initially, it seemed as if they had
> disappeared following surgery, only to reoccur in the last year. Other times it Ms.

8

> Bayonne notes these symptoms have been present since the surgery on the acoustic neuroma. She occasionally gets left sided headaches without nausea or vomiting. Of note is the fact that for the past few months she had had numbness in the inside of the right leg. . . In summary, this is a middle-aged woman who has undergone surgery for an acoustic neuroma. Since that time, she has complained of left sided numbness and clumsiness. It is unclear whether these symptoms have worsened, and the etiology of her left side symptomatology is unclear.

See Appendix A: Administrative Record pp. 103-104.

38.    Defendants admit receiving a letter dated December 18, 2001 from Dr. Roslyn Posner Einbinder, which states "Ms. Bayonne will be medically unable to work for two weeks while she is under going neurological care." See Defendants Answer at ¶ 22, Revised Amended Complaint at ¶ 22 and Appendix A: Administrative Record at p. 148.

39.    On July 2, 2002, Defendants sent Plaintiff a letter describing the criteria for qualifying for short term disability benefits, which stated in pertinent part,

> Factors which will generally **NOT** be considered in the determination of eligibility for Short Term Disability . . . include: milde to moderate sleep disturbance, job related stress, **<u>subjective complaints of illness or discomfort without objective medical findings.</u>**

See Appendix A: Administrative Record pp. 114, 308.

40.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated July 3, 2002, regarding Plaintiff's qualifications for short term disability benefits. See Defendants Answer at ¶ 23, Revised Amended Complaint at ¶ 23 and Appendix A: Administrative Record at p. 115.

41.    On July 5, 2002, Plaintiff's treating neurologist sent a letter to the Defendants regarding her ability to return to work on a 32 hour work week. See Revised Amended Complaint at ¶ 24 and Appendix A: Administrative Record at p. 217.

42.     Defendants admit that Pitney Bowes sent a letter to Plaintiff dated July 10, 2002 denying short term disability benefits with an effective date of June 24, 2002, based on the explanation that medical documentation provided did not support her disability. See Defendants Answer at ¶ 25, Revised Amended Complaint at ¶ 25 and Appendix A: Administrative Record at pp. 116, 120.

43.     On July 12, 2002, Dr. Einbinder sent a letter referring Ms. Bayonne to Dr. Madeline Kitaj, stating in pertinent part:

> Ms. Bayonne has been under my care since October of 2000 for headache which preceded and continued following excision of a small left acoustic neuroma by Dr. John Kveton in April 19, 2000. She additionally had primary left upper and some left lower extremity dysfunction preceding this surgery without clear explanation of such on extensive diagnostic studies performed by multiple physicians. I am referring her to you primarily to help with control of her headaches. We have tried a few medications which have included Inderal which resulted in palpitations, Pamelor, Elavil and Neurontin.

See Appendix A: Administrative Record at p. 136.

44.     On July 15, 2002, Plaintiff's neurologist Dr. Roslyn Posner Einbinder completed the Pitney Bowes treating physician statement in support of Ms. Bayonne's STD claim, which stated in pertinent part:

> A primary diagnosis of left hemiparesis, treatment plan and expected outcome-medication alone prognosis uncertain. Return to work-uncertain, will re-evaluate on 7/20/02.

See Appendix A: Administrative Record at pp. 122-123.

45.     On July 19, 2002, Dr. Peter Griffin, medical consultant to Pitney Bowes, issued a denial of Plaintiff's STD claim even though he never physically examined her, that stated in pertinent part:

> Deny 6 hours work restriction. I spoke to Dr. Einbinders office. There does not appear to be any specific functions & impairment to explain ee's need for a 6 hour work day. Current impairment of mild hemiplagia is [absent][sic]. Deny STD, again, hemiplagia symptoms stable.

See Appendix A: Administrative Record at p. 124.

46.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated July 22, 2002 denying short term disability benefits with an effective date of June 24, 2002, based on the explanation that medical documentation provided did not support her disability. See Defendants Answer at ¶ 26, Revised Amended Complaint at ¶ 26 and Appendix A: Administrative Record at p. 117.

47.    On July 24, 2002, Plaintiff's physician Dr. Xu issued a report to Pitney Bowes and made the same findings as in her November 16, 2002 report. See Appendix A: Administrative Record at p. 135.

48.    On July 30, 2002, Plaintiff's neurologist Dr. Roslyn Posner Einbinder sent a letter to Pitney Bowes and stated, "Ms. Bayonne is able only to continue with work at 32 hours per week. She will be re-evaluated on August 13, 2002 and which point we will decide how to proceed." See Appendix A: Administrative Record at p. 150.

49.    Defendants admit receiving a letter dated August 1, 2002 from the Plaintiff, regarding her appeal of the denial of short term disability benefits, that stated in pertinent part:

> Consider this my written appeal of my denial date June 24, 2002. I am attaching additional medical information related to the denial of my disability claim.
>
> At this time my neurologist has indicated that there is no treatment or cure for my side effects that I am suffering. I was denied disability 6 months after surgery. I went back to work and have tried and cannot effectively do my job up to the level that I am expected. Being deaf, having to swing my head is impossible to work in an open and such heaving traffic noise. I would like to have the opportunity to work 32 hours in order to see if this works out for me. I am asking for accommodations due to my disability.
>
> I have always been a good worker and up until my disability was not absent other than the normal occasional absence. In fact, it was my choice to try and return to

work after my brain operation when I could have continued to be approved
medically. I am asking that you look carefully at the medical information
provided and work with me to see if we can come to some compromise. Because
of the nature of my disability, I am at a loss to know exactly how I am feeling
each every day. Sometimes, I feel OK when I get to work but during working I
begin to feel ill and must go home.

Having worked for Pitney Bowes for 11 years, I am at a loss as to what other
avenue I will have to pursue in order to deal with my disability should you not
approve my medical absence. I need to work and want to work.

See Defendants Answer at ¶ 27, Revised Amended Complaint at ¶ 27 and Appendix A:

Administrative Record at p. 149.

50.    On August 9, 2002, Dr. Griffin, physician consultant to Pitney Bowes,

filed a report on Ms. Bayonne's STD claim, and stated in pertinent part:

Approve restriction 6 hours & I spoke with treating neurologist who notes that
restrictions should be considered [reasonable] & that it is likely that her symptoms
will progress. [STD Approved].

See Appendix A: Administrative Record at p. 125.

51.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated August

12, 2002, regarding approval of her modified transitional schedule for short term

disability benefits to full return to work beginning on July 8, 2002 to October 11, 2002

based on a six hour work day. The letter stated in pertinent part:

Based upon medical information provided to us by your attending physician and
relevant provisions of the Short Term Disability . . .policy, it has been determined
that your modified transitional schedule from Short Term Disability . . .benefits to
full return to work will begin on 07/08/02 and extend through 10/11/02 based on
the following conditions: Limit To: 6hr/day.  This note must accompany you the
day you return to work, otherwise management will not be authorized to accept
these restrictions. If you work in CT and have access to the medical clinic, you
must stop in the clinic before you return to work.  These restrictions are
considered transitional to your regular duties, are limited in duration based on
corporate Disability policy and will be reviewed periodically by the Disability
Department. You are expected to return to full duty scheduled the first workday
following the expiration date noted above.

See Defendants Answer at ¶ 28, Revised Amended Complaint at ¶ 28 and Appendix A:

Administrative Record at p. 118.

    52.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated August

12, 2002, which stated in pertinent part "the information reviewed substantiates total

disability for the period from 6/24/2002 through 7/5/2002, and you are, therefore

approved from 6/24/2002." The letter stated in pertinent part:

> This letter is to inform you that the Pitney Bowes Medical Director/Consultant
> has reviewed the clinical information provided to TIME OUT by your attending
> physicians, as well as relevant provisions of the Short Term Disability. . .policy in
> connection with your appeal of the denial of Short Term Disability . . .benefits.
> The information reviewed substantiates total disability for the period from
> 06/24/02 through 07/05/02, and you are, therefore approved from 06/24/02.

See Defendants Answer at ¶ 29, Revised Amended Complaint at ¶ 29 and Appendix A:

Administrative Record at p. 119.

    53.    Defendant admit receiving a letter dated August 12, 2002 from Dr. Roslyn

Posner Einbinder, which stated "Ms. Bayonne is temporarily 100% disabled and we will

reevaluate her on September 5, 2002." See Defendants Answer at ¶ 30, Revised Amended

Complaint at ¶ 30 and Appendix A: Administrative Record at p. 216.

    54.    Defendants admit receiving a letter dated September 5, 2002 from Dr.

Roslyn Posner Einbinder, which stated "Ms. Bayonne is temporarily 100% disabled and

we will reevaluate her on September 26, 2002." See Defendants Answer at ¶ 31, Revised

Amended Complaint at ¶ 31 and Appendix A: Administrative Record at p. 236.

    55.    Defendants Disability Department employee Phawana Chaorinuea made

an internal note to Plaintiff's short term disability file, which stated in pertinent part,

"Will revisit this issue after **resolve the mystery of her medical condition**." See
Appendix A: Administrative Record at p. 311.

56.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated
September 12, 2002, which approved short term disability benefits, "it has been
determined that your Short Term Disability . . . benefit will begin on 08/12/2002 and
extend through 09/27/2002 based on the following conditions: (1) you are otherwise
eligible, and (2) no additional information is received which alters this determination."
See Defendants Answer at ¶ 32, Revised Amended Complaint at ¶ 32 and Appendix A:
Administrative Record at p. 156.

57.    On September 16, 2002, Defendants physician consultant, Dr. Arthur
Broder, who never personally examined Plaintiff, sent an internal letter to "Cathy"
[unknown] and stated in pertinent part,

> Persistent Left upper extremity weakness. Alleged left hemiparesis, 'Absent' any
> objective positive neurologic findings to corroborate the persistent subjective self
> report symptomatology (Three Neurologists including her treating Neurologist).
> Ongoing treatment by a Dr. Einbinder (treating Neurologist), who has opined that
> Ms. Bayonne is permanently disabled from any gainful employment. Report of
> headaches, a self-report symptom, that has yet to be objectively substantiated.
> Appreciate your observing Ms. Bayonne's performance for consistency, putting
> forth maximal effort, abnormal pain mannerisms, positive Waddell Signs. Provide
> your observations and opinion as to whether Ms. Bayonne's Physiognomy
> evidences any muscle atrophy of the upper or lower extremities."

See Appendix A: Administrative Record p. 312.

58.    Defendants admit that Plaintiff underwent a Functional Capacity
Evaluation by PhysioMetrics on September 18, 2002. Defendants further admit that
Jamie Hupp and Edward M. Velasquez, M.P.T. issued a report dated September 23, 2002,
which stated in pertinent parts,

During the floor to waist lift, Ms. Bayonne lifted 18 pounds while using unsafe body mechanics as she fully forward bent and minimally squatted to lift the container. She utilized an average pace and used a closed-hand grasp to complete lift. Upon termination she reported, 'I am getting dizzy." During the waist to overhead lift, she did not complete one full repetition, but she lifted 15 pounds while demonstrating safe body mechanics as she lifted with an erect posture while keeping the container close to her body. She lifted an average pace and upon termination she reported, 'this shaking is getting to me. . . based on the results of the FCE, Ms. Bayonne demonstrated a SUB-CONSISTENT effort. The effort was less than consistent. . .The effort demonstrated by Ms. Bayonne should be considered her maximal tolerances at this time. There are several factors that are taken into consideration when determining overall consistency, which include, but are not limited to the following. Ms. Bayonne tested positive for Waddell's Non-Organic Signs of symptom magnification. These signs included a report of; demonstrated an inconsistent Jamar grip test, as the pattern of the grip graph did not follow expected statistical trends. Ms. Bayonne was also positive for overreaction as she demonstrated inconsistent forward bending and squatting range of motion. In addition, when digitally analyzed, she demonstrated inconsistencies in her movement patterns during the lifting activities.

See Defendants Answer at ¶ 33, Revised Amended Complaint at ¶ 33 and Appendix A:

Administrative Record at pp. 82-91.

59.    Defendants admit that Pitney Bowes sent a letter to Plaintiff dated

September 27, 2002, approving short term disability benefits, "it has been determined

that your Short Term Disability . . .benefit will begin on 08/12/2002 and extend through

11/01/2002 based on the following conditions: (1) you are otherwise eligible, and (2) no

additional information is received which alters this determination." See Defendants

Answer at ¶ 34, Revised Amended Complaint at ¶ 34 and Appendix A: Administrative

Record at p. 153.

60.    On September 30, 2002, Pitney Bowes requested Ms. Bayonne to attend

an Independent Medical Examination (IME) with Dr. Elliot Gross, a neurologist on

October 15, 2002.  See Appendix A: Administrative Record at p. 160.

61.     Defendants admit receiving a letter dated September 30, 2002 sent by Dr.

Roslyn Posner Einbinder, which stated in pertinent part, "Ms. Bayonne was seen in

neurologic follow-up on September 26, 2002. It has become clear that she is medically

unable to work any longer and is permanently disabled." See Defendants Answer at ¶ 35,

Revised Amended Complaint at ¶ 35 and Appendix A: Administrative Record at p. 162.

62.     On October 2, 2002, Dr. Arthur Broder, physician consultant for Pitney

Bowes, who never personally examined Plaintiff, requested an independent neurologic

assessment of Plaintiff from Dr. Elliot Gross, for purposes of evaluating her STD claim.

Dr. Broder stated in pertinent part,

> It is medically significant that Ms. Bayonne did not have "true brain surgery" but
> intracranalicular removal of an acoustic neuroma, absent any involvement of the
> cerebellar pontine region, or the brain as entity in of itself. Ms. Bayonne has been
> afflicted with headaches since 1993, therefore, there is absence of any causal
> relationship between the acoustic neuroma surgery and the headaches. The left
> facial weakness/numbness can be related to either the tumor, the surgery, or a
> combination thereof. The left upper and lower extremity weakness is based upon
> a condition compatible with conscious forcing, symptom magnification, non-
> organic/non-structural pain syndrome, corroborated and substantiated by the give-
> way weakness in the left upper/lower extremity, noted 10/10/00, absent any
> decrease in muscle strength or demonstrated atrophy of the muscles of the left
> upper/lower extremity. . .

> Based upon all of the aforementioned and your neurologic evaluation of Ms.
> Bayonne, please opine as to whether Ms. Bayonne is functionally, neurologically
> capable of returning to the work force as a cashier for Pitney Bowes. Please opine
> as to whether Ms. Bayonne is afflicted with any neurologic condition compatible
> with a left upper/lower neurologic condition that would render Ms. Bayonne
> functionally/physically disabled.

See Appendix A: Administrative Record at pp. 168-172.

63.     On October 4, 2002, Defendants physician consultant, Dr. Arthur Broder,

who never personally examined Plaintiff, sent an internal correspondence to Phawana

Chaorinuea, and stated in pertinent part,

Having performed the surgery myself, I can say that there is absence of any possible cerebellar/pontine damage that could have occurred intra-operatively. (the tumor, was entirely within the internal auditory canal, at the CP angle). **There is the possibility, that the facial nerve, may have sustained some injury during dissection/removal of the tumor**. *This is a known possible, surgical, "complication", however, the tumor may have invaded the nerve, prior to surgery.* Have said that, there is complete absence of any "Brain Damage", that could have occurred as a result of the surgery.

See Appendix A: Administrative Record at p. 317.

64.    On October 15, 2002, Plaintiff attended an Independent Medical Examination (IME) and brought with her copies of her MRI's going back to 1996 (a total 1996,1999, 2000, 2002)(4 sets). See Appendix A: Administrative Appeal Memorandum of Law dated June 11, 2003 at ¶ 22.

65.    During the October 15, 2002 IME, Dr. Gross only examined one copy of an MRI, for one minute, as she was leaving the office. See Appendix A: Administrative Appeal Memorandum of Law dated June 11, 2003 at ¶ 22.

66.    During the October 15, 2002 IME, Dr. Gross asked Plaintiff repeatedly whether she was going to pay him for the visit.  See Appendix A: Administrative Appeal Memorandum of Law dated June 11, 2003 at ¶ 22.

67.    Defendants admit that Plaintiff underwent an Independent Medical Examination by Elliot G. Gross, M.D. on October 15, 2002. Defendants further admit that Dr. Gross issued a report dated October 29, 2002, which stated in pertinent part,

She had a **very variable type of dysarthria which was difficult to characterize**. . .Facial sensation was decreased on the left and her seventh nerve function was decreased on the left but she had 85% control of her facial movements. Eighth cranial nerve was decreased on the left but nine and ten were intact. Her tongue weakly deviated to the left implying a right twelfth nerve which is inconsistent. Motor examination was 5/5 with collapsing weakness but normal with encouragement. There was no drift and rapid alternating movements and rapid successive motions were equal. There was no ataxia of limbs, no tremor when informally watching her but yet when formally testing finger to nose, **she**

<u>demonstrated an irregular, unusual type of tremor</u>. Reflexes were 2+ and equal except for the left knee jerk which was 2++. Both plantar responses were flexor. She frequently took her glasses off and put them back on with one hand without any tremor, but formally testing finger to nose, <u>there was a 3+ very variable tremor. Sensory examination revealed diminution on the left side to pin, touch and vibration, splitting the midline to vibration across the chin, the lower incisors, the nose and the sternum</u>.

the overall impression is that there is <u>**tremendous symptom magnification**</u> and apparent neurological deficits which are not anatomically correlated to the surgical removal of the acoustic . . .I believe that her symptoms post-operatively are primarily characterized by symptom magnification and has no bearing on any organic structural disability incurred from the operation. Further, I feel she can continue to work as a cashier without any restrictions.

See Defendants Answer at ¶ 36, Revised Amended Complaint at ¶ 36 and Appendix A:

Administrative Record at pp. 98-100, 250-252.

68.   Defendants admit that Arthur I. Broder, M.D., Defendants physician

consultant who never personally examined Plaintiff, prepared a report on November 1,

2002, which stated in pertinent part,

"Based on review of the records from Drs. Resor, Einbinder and Xu, it is medically evident that the neurologic and physiatric treatment to Ms. Bayonne in the past and currently, would be unrelated to any anatomical, pathophysiological condition that can be corroborated and substantiated by valid, neurological assessments . . .<u>Ms. Bayonne's apparent affliction with a condition compatible with symptom magnification, can only be explained by Ms. Bayonne's possible affliction with conscious forcing</u>. *The reasons for conscious forcing are therefore then known only to Ms. Bayonne*. Dr. Gross' neurological opinion apparently is valid and can be corroborated by Ms. Bayonne's evidencing the absence of any neurophysiological objective, positive findings that would corroborate and substantiate her persistent presentation to Drs. Einbinder and Xu."

See Defendants Answer at ¶ 37, Revised Amended Complaint at ¶ 37 and Appendix A:

Administrative Record at pp. 96-97.

69.   Defendants admit that Brent Pawlecki, M.D. prepared a report on

November 4, 2002, which stated in pertinent part, "her neuro claimed that ee is

18

permanently disabled. Neuro IME reveals ee is symptom magnification and can RTW

[return to work] & restrictions. Return to limited duties, 11/5/02 and advance to full time

and full duties on 11/11/02." See Defendants Answer at ¶ 39, Revised Amended

Complaint at ¶ 39 and Appendix A: Administrative Record at p.113.

      70.    Defendants admit receiving a letter dated November 12, 2002 from Dr.

Roslyn Posner Einbinder, which stated,

> As you may recall it has been my impression that she is medically unable to work. She has tried to work since her surgery as a result of increasing neurologic symptoms when she is fatigued which include headache and neck pain she cannot. Dr. Gross believes that Ms. Bayonne is able to work and feels that her symptoms are a result of symptom magnification and 'apparent neurological deficits which are not anatomically correlated to the surgical removal of the acoustic.' While I understand his impression **it is clear that headache following posterior fossa surgery can occur and can be quite difficult to treat and worsened with fatigue as well. It is also clear that in cases with acoustic neuroma there can be persistent VII and VIII nerve dysfunction resulting in facial weakness and vertigo again which worsens with fatigue. Ms. Bayonne has a documented weakness of her face on the side of the surgery and has a documented abnormality on ENG consistent with vertigo all of which worsen when fatigued.** I understand that her left upper extremity symptoms are not accompanied with anatomic neurologic abnormalities, however this is not the primary reason for her disability. While I understand that Dr. Gross feels that Ms. Bayonne has symptom magnification **it is clear that she has objective neurologic abnormalities which result in symptoms.** It is also clear that she cannot work as she has tried to aggressively and cannot get through a day, even a six hour day as her headache and vertigo become unbearable. I do not feel that one can realistically deny Ms. Bayonne disability based on Dr. Gross' IME and **feel that you either need to get another neurological or ENT opinion or if you are under the opinion that she has symptom magnification and none of her symptoms are real ought to consider having her seen psychiatrically to determine whether there is an psychiatric basis for this diagnosis** in a patient I feel has tried quite aggressively to return to work.

See Defendants Answer at ¶ 40, Revised Amended Complaint at ¶ 40 and Appendix A:

Administrative Record at pp. 101-102, 234-235.

      71.    Defendants admit receiving a letter from Plaintiff dated November 16,

2002, which stated,

I am writing to you regarding my disability which started after a removal of an acoustic tumor on April 2000. I returned to work in September [and] have tried to do my job to the best of [my] ability, unfortunately I had to stop [a] few weeks later because of the pain, the headaches, neck pain, speech problem, spasms, noise triggers my head and face pains- my balance dysfunction, swinging of my head, talking can be a big challenge . . .my condition worsen[s] under stress such as walking and all the above. Also an increase tremor occurs when lifting, holding, grasping, reaching. My gait occurs when I bend my head, at other times spontaneously the numbness of my face makes it difficult in my eye closure. My arm and leg get numb after repetitive walking. Such symptoms had been present to a lesser degree before surgery. . . My medical condition has not improved since August 12, [2002]. Pitney Bowes had requested an IME consultation and physical evaluation which occurred a few weeks ago. After the physical evaluation, the nurse Phawana contacted me over the phone [and] stated that my job site did not have or could not accommodate me because of my condition, in addition I have received another call from the same nurse stating that, I am capable of returning to work at this time. I am very confuse[d] as what to do. . .therefore [sic][I] am asking you to please look at my situation with a fresh eye in helping me with my case. I would love to work but cannot.

See Defendants Answer at ¶ 41, Revised Amended Complaint at ¶ 41 and Appendix A:

Administrative Record at pp. 107-108.

72.    On November 16, 2002, Dr. Priscilla Xu, Plaintiff's treating physician,

issued a treatment report to Pitney Bowes, that stated in pertinent part:

Ms. Bayonne is a 51 year old female with history of HTN, acoustic neuroma status post surgical resection in April 2000 with a residual left facial paralysis and mild left side hemiplegia who presents with left sided neck pain and muscle spasm and headaches since the surgery. She also complains that throughout the day the left facial numbness and weakness, and left arm and leg weakness, all worsen, especially since returning to full time employment. She has received multiple sessions of physical therapy and electro-acupuncture which has relieved her symptoms significantly. But her symptoms returned when acupuncture treatment stopped. She complains of persistent headache, neck pain, noise intolerance, poor balance and worsening of left facial numbness and weakness. Her symptoms prohibit her from functioning well at work.

On physical exam her blood pressure is 125/90 and her pulse is 53. She appears in pain. She has a left facial droop with flattened nasal crease. The strength of her left facial muscle and left eye lid closing are decreased. She has generalized decreased sensation on the left face by light touch. She demonstrates mild limited range of motion of cervical spine to extension and left side bending. Pain is reported in the left paracervical and left upper trapezius muscles during AROM of

20

cervical spine. Tenderness and tightness are elicited by palpation of the left paracervical and upper trapezius muscles. She demonstrates full range of motion of bilateral upper and lower extremities, mild decreased muscle strength of left upper and lower extremities (5-/5), and generalized decreased sensation throughout the left side of the body. Deep tendon reflexes at left arm and knee are slightly increased. There are no Hoffman or Barbinski signs. She also demonstrates a mild flaccid dysarthria after speaking for a prolonged period. Dynamic balance is impaired.

See Appendix A: Administrative Record at p. 110.

73.    Defendants admit receiving a letter from Plaintiff dated November 19,

2002, which states,

I would like to take this opportunity to reiterate to you that my medical condition has not improved in the last few months. After my brain surgery, I tried to return to work and I was performing to the best of my ability, and as stated by all my doctors Dr. Einbinder, Dr. P. Xu and Dr. Devaraj Shanty, my functional capacity has decreased significantly and I am presently unable to continue working. It seems very unprofessional to me that someone else not familiar with my case, will take only twenty minutes to review my medical records asses my medical status, and render a decision about my ability to return to work, **assuming that I am losing 'it' or that I am faking it. I rather be working than sitting home at 51 years** of age. I am requesting a professional revaluation of my case or in other words the acceptance of the professional opinion provided by the above respected care providers, who have been monitoring my medical condition over the last few years.

See Defendants Answer at ¶ 42, Revised Amended Complaint at 42 and Appendix A:

Administrative Record at p.109.

74.    Defendants admit that on or around November 22, 2002, Plaintiff was

notified of the determination that she was not entitled to short-term disability benefits

under the terms of that Plan. Defendants further admit Plaintiff did not satisfy, among

other things, the Plan's requirements with respect to its Qualifying Period as defined in

the Plan. See Defendants Answer at ¶ 43.

75.    On November 22, 2002, Defendants physician consultant, Dr. Peter

Griffin, who never personally examined Plaintiff, made a handwritten medical report,

21